Filed 11/25/24  P. v. Morlett CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G062510 |
| v. | (Super. Ct. No. 13HF1149) |
| OSCAR LUIS MORLETT, III, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Michael A. Leversen, Judge. Affirmed.

James M. Crawford, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Junichi P. Semitsu, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

Oscar Luis Morlett, III (Morlett) was convicted of murdering his stepmother. The two lived together, and one day, when no one else was home, he bludgeoned her to death with a pickaxe. His defense at trial was insanity.

Morlett raises two issues on appeal: first, he argues that the court wrongly admitted a confession obtained in violation of his Miranda rights; second, he argues that the court failed to instruct the jury on provocation, both in the form of voluntary manslaughter and second degree murder.

We agree with the trial court's conclusion that Morlett's confession was voluntary. He was properly informed of his Miranda rights before the confession, and although he did not explicitly waive those rights, the context clearly shows that he understood them and chose to proceed without an attorney.

We also conclude that there was insufficient evidence to justify a voluntary manslaughter or provocation instruction based on a heat-of-passion theory. There simply was no evidence of provocation. Therefore, there was no error in omitting such an instruction. Accordingly, we affirm the judgment.

FACTS

I.

MORLETT MOVES IN WITH HIS FATHER, BUT IS THEN TOLD HE MUST LEAVE, PROMPTING HIS ANGER TOWARD HIS STEP MOTHER

In the Summer of 2013, Morlett, 20 years old, was kicked out of his biological mother's home where he had been residing. After several weeks of homelessness, his father took him in. He took Morlett's younger brother in at around the same time. Morlett's father was married to Jeanne Morlett at

the time, who also lived there.[1] While living there, Morlett was provided free food and clothes. According to Morlett's younger brother, Jeanne was kind and helpful to both of them. Morlett and Jeanne seemed to have a "cordial" relationship.

Not long after Morlett had moved in, however, he received upsetting news: his father and stepmother were planning to downsize and move into a smaller unit. As a result, Morlett grew angry and felt that they were pushing him out of the house.

Morlett felt that Jeanne was the one who wanted to kick him out of the house and send him to a charitable mission, which sparked or exacerbated his anger toward her. He then began expressing that antipathy to others. For instance, on June 25, 2013, he posted a social media message stating, "I really am hating on my stepmom! And fuck her Honda Hybrid!"

Morlett's comments about Jeanne became violent. On or around July 13, he posted on social media: "I fucking hate that bitch. I just wanted to be like O.J. Simpson. Fucken furious about step parents!" Around that same time, he also wrote on social media that he was about "to roll back on being . . . ratted out by Jeanne . . . bitch ass, trying to sell secrets over the phone."

Morlett's vitriol manifested itself in non-verbal ways as well. Not long before the murder, he put patchouli or "Kama Sutra" oil into her water bottle because he "wanted to make her sick." After realizing what Morlett had done, Jeanne told her husband to talk to him about it, which he did.

---

[1] Because Jeanne shared the same surname as the defendant, we refer to her by first name.

Finally, just two days before the murder, Morlett expressed his desire to kill Jeanne to his neighbor. Morlett went to the neighbor's home to try to meet up with the neighbor's then-16-year-old son, who had befriended Morlett weeks earlier. The neighbor invited Morlett inside to chat and to provide him support, knowing he had just turned 21 years old and was struggling. At one point during their conversation, Morlett angrily blurted out, "I hate my fucking stepmom," and said he wanted to kill her. He seemed "very paranoid" and, at one point, remarked that he believed Jeanne was a spy.

## II.

### MORLETT KILLS JEANNE

On the morning of August 9, 2013, Jeanne, Morlett, his father, and his younger brother were all inside the house. Morlett's younger brother recalled that Morlett seemed fine when he saw him that day. That morning, father left the house while Jeanne was still in bed and Morlett was watching television on the couch. At one point, Jeanne came downstairs to make coffee, said hello to Morlett's younger brother, and then went back upstairs. By 10:30 a.m., Morlett's brother had left for work, leaving Jeanne and Morlett as the only two remaining in the residence. At no point that morning (or at any time before) did father or younger brother observe any tension or argument between Morlett and Jeanne.

Around that time, Morlett made the decision to kill Jeanne. He went outside to retrieve a foot long pickaxe with a wooden handle from the backyard and then returned inside. He put on gloves to avoid leaving fingerprints on the axe.

4

Armed with the pickaxe, Morlett entered Jeanne's room and yelled at her, "you've always stole my story, you've always been a rat to me, you've always, you know, been a negative influence in my life and . . . I want to take you to heaven." As Jeanne started screaming, Morlett used the pickaxe to "bash[]" and "whack[]" her left thigh and then her right thigh before eventually hitting her "[a]ll over."

Morlett tried "to cut her vital organs and veins from inside," hoping to "get her spinal cord and the upper tissue under her armpits." He wanted to make it "[q]uick and painless." He recalled that it was "raining" blood everywhere, creating a "blood of sunrise."

Morlett left Jeanne's body on a tarp, which he described as "a black Astroturf looking thing." He then returned the pickaxe to where he found it, burned his gloves, and left the scene.

Shortly afterward, Morlett dialed 911 from his cell phone to report that he saw someone "attack[] [his stepmother] right in front of [him]" during a home invasion. He claimed he managed to escape out the back door. When the call was disconnected, the dispatcher called Morlett's cell phone, but was sent to voicemail.

Morlett then biked to Saddleback Church. Two people saw him and approached him out of concern that he may have fallen and hurt himself. Morlett told them that his stepmother had been attacked by gardeners, that he had to flee for his life, and that he needed to use a phone because he had "no access to electronics." Two of the witnesses saw dried blood on Morlett's hand and blood stains on his fingernail beds.

Morlett then used one of the community center's telephones to call 911 again. This time, he reported to the dispatcher that he "was chased out of [his] house. . . by a couple gardeners in a truck. He said he did not

know the gardeners who attacked Jeanne, but they were driving a tan Toyota truck with black rims. He then told the dispatcher that he "d[id]n't have any telecommunications or electronics" and was just "sitting [t]here like a duck."

First responders arrived at the house around 11:20 a.m. and soon discovered Jeanne's bloodied, unresponsive body on the ground. She had sustained 17 puncture wounds, including a fatal hack to her lungs, all of which caused her to bleed to death. A subsequent autopsy revealed that she had suffered blunt force trauma to her face, jaw, neck, chest, abdomen, and thighs.

Officers also found significant blood evidence at the scene of the crime. Stains from bloody fingers had been smeared on the walls and on the doorframe of the master bedroom. Blood stains on the carpet and stairs became progressively fainter as the trail led away from the victim's body. Blood was also found in various locations within the house—a sleeveless shirt in the bedroom, the sink in the upstairs bathroom separate from the master bedroom, and bloody paper towels in the trash can. And finally, officers recovered the murder weapon—the pickaxe—which also had blood stains on the head of the axe.

A subsequent forensic investigation tied Morlett to the crime. DNA samples obtained from the victim matched Morlett's DNA. Blood found on the sleeveless shirt contained DNA consistent with both Jeanne and Morlett. Blood from paper towels in the trash can contained a DNA profile that "was consistent with [Morlett]." Blood found on Morlett's sock contained DNA consistent with Jeanne's DNA. The forensic specialist who collected Morlett's DNA swabs observed that Morlett's hands also had notable cuts and bruises.

## III.

### THE POLICE INTERVIEW

Investigator A. Quilantan of the Orange County Sheriff's Department arrived at Saddleback Church to meet with Morlett. Morlett was then transported to the Sheriff's headquarters for an interview with Investigator Quilantan, Investigator Montano, and Deputy Hansen.

At the outset of the interview, Investigator Quilantan read Morlett his *Miranda* rights, and Morlett indicated that he understood each of those rights, though he did not secure an explicit waiver of those rights.

During the initial portion of the interview, Morlett echoed what he said during his second 911 call: that he feared the gardeners had done something to Jeanne. He said that after he left the house, Jeanne called him and her voice "sounded really faint and scared". He claimed he was worried because he recalled seeing gardeners in the backyard. Those gardeners, according to Morlett, would "throw gang signs" and "would show like too much enthusiastic [sic] about how they liked to be a gardener." He also suggested the "very Hispanic" gardeners might have done something to Jeanne because she was white, as they "would hate and discriminate on a white society population, especially in a neighborhood like that."

Morlett then claimed that as he headed to Saddleback, he "saw the gardeners and a few of their gardening trucks." One truck, in particular, "popped out" to him—a "very tan Toyota" with black tinted rims.

Asked why Morlett had blood on his hands, he responded that he enjoyed tattooing himself. Because of his recent tattooing, he told officers that they would find blood "all over [his] towel" that he lays over his bed. Asked to explain the blood on his shoes, he said that the stains were just dirt and that he hadn't cleaned his shoes in six months. When the investigator clarified

7

that blood was on the bottom of his shoes as if he had "stepped in blood"—and that it was "not a speck of blood, but a lot of blood"—Morlett simply responded, "I wasn't there."

After steadfastly denying involvement, the investigators then informed Morlett that Jeanne had died from the attack. He began crying and asked, "Who would do something like that?" Very shortly thereafter, Morlett invoked his right to counsel. Investigators immediately stopped questioning him and placed him under arrest for Jeanne's murder. Investigators Montano and Quilantan then left the room to grab some paperwork, while Deputy Hansen stayed behind with Morlett.

While waiting for the investigators to return with paperwork, Morlett spontaneously told Deputy Hansen that "I did fuck that bitch up." Deputy Hansen asked, "Well why didn't you tell the investigators that?" Morlett responded, "I'm not talking to the investigator." Deputy Hansen replied, "Well I mean you can talk to me without a lawyer if you want. It's your, your decision." He then asked, "Why'd you fuck her up?" Morlett responded, "'Cause she was – she had me ratting on, on my best friend. . . . . She had me ratting on a few friends, that I didn't want to rat on." Deputy Hansen then said, "I don't want to make—I don't want it to be like I'm sitting here questioning you 'cause you asked for a lawyer, you know what I mean? So—" Morlett replied, "Yeah. Well I know, I'm guilty-I'll still fight it 'cause I have the money to but. . . ."

Deputy Hansen then asked Morlett how he "fucked her up," to which Morlett replied, "I saw dad rape her and then . . . I saw Oscar rape her and then I went 'cause I didn't want her to tell on 'em and I finished her. A brutality a sick one." He stated that he beat her with a pick axe. He then

asked that the investigators be brought back in so he could "retell the story and get it straight."

Investigator Quilantan returned, stating, "Um, when we last left here, you had said you wanted to talk to a lawyer." Morlett: "yeah." Investigator Quilantan: "I read you your rights earlier and you said you understood 'em and said that, uh, you agreed to talk. Then you told us you didn't want a lawyer. I was told by our deputy out in the hallway that you wanted to talk now." "Is that true?" Morlett stated that it was.

Morlett then explained that he "nailed that bitch" because, among other things, "she wanted to send me to a mission in Tustin" and "she was trying to sell . . . my family's house." He continued to express a litany of grievances about all the ways that Jeanne annoyed or angered him. He blamed her for tearing up and bankrupting his family: "that bitch got us poor, swore us poor." He referred to Jeanne as "ugly," a "bitch," and a "prostitute stepmom" who made them poor. He complained that she "microscoped" his life choices. After he saw her "c[o]me down all slutty looking," he remarked that she was "not the girl [he] wanted [his] dad to be with," and so he had to "prove that [he] can do what [he] needed to do."

Morlett then proceeded to let investigators know how he killed Jeanne. Despite the severity of his attacks on her vital organs and spine, he claimed that he only wanted to hurt her and did not think that she would die; in fact, he "knew she would survive" since she was "snoring" when he left her. Later he acknowledged that he was "trying to cut her vital organs and veins from the inside" and "tried to get her spinal cord and upper tissue under her armpits" so that it would be "quick and painless."

9

Morlett told the officers they wouldn't find his fingerprints because he wore gloves that he burned. When the investigators asked where the murder weapon was, he told them he left the pickaxe outside, next to the air conditioner. Investigators immediately used this information to tell other officers at the crime scene to look for the axe.

At the end of the interview, Morlett admitted, "Yeah, I fucked up. I know that. But it doesn't make me guilty inside."

IV.

MORLETT COMMENTS ON THE KILLING WHILE IN CUSTODY

On September 6, 2013, while in custody, Morlett spoke to his father on the telephone for the first time since killing his wife. Father asked his son, "Are you aware of what you did?" Morlett replied, "Heck yeah . . . . And I know it was hard . . . for both . . . for all of us." Morlett went on, "And that there's much love to be looking forward to. I don't want to make anymore [sic] mistakes. I just want to be right. And for that, I want to say I'm sorry for the hardships that we had to go through. And I just wanted, you know, be able to have the family on my back and no one else. No, no other people. I just want to have the family on my back and know that what I did was okay." Father responded, "What you did was okay? Is that what you just said? . . . `What did you just say?" Morlett then added that he is "on a lot of medications" and that he was "sorry that [he] did that." During that same conversation, father asked his son whether he had anything to say to Jeanne's sister. Morlett responded, "Tell them I fucking did her wrong and she did us wrong. She . . . swore us broke and I didn't want to accept that."

On October 3, 2013, Morlett spoke to his mother, stating: "The fact that I did what I did is . . . I thought it was a second life I was living and I didn't want to, so I took the actions that I took. I would still do it again. I

just know that I'm going to waste a lot of time here. It's not like I'm sorry now. I don't say sorry, but I have got to stand up for myself."

Ten days later, Morlett again called his mother to apologize and said, "I fucked up." Later in that conversation, appellant and his mother had this exchange:

"[Morlett]: I know what I did was wrong. It's the worst sin you can do and I still know what I did and the reason why I did it. I just want to change. . . . just want to be supported also.

"[Mother]: You are . . . why did you do what you did?

"[Morlett]: Because there's creation in death, Mom." Later he said, "I'm so much fucking smarter than this . . . and I have to go out because of some stupid bitch step mom . . . that doesn't know how to be a mom, and didn't know how to be there for us and swore us broke, and now all I have to is [sic] take it . . . .

"[Mother]: Take what? What did you take?

"[Morlett]: I took it in the desire to hurt somebody and I hurt someone bad."

On November 13, 2013, Morlett again spoke to his mother. He said that he and Jeanne first began arguing after he once saw her naked and he "didn't like her body." He mentioned that she had "[c]onspiracies about certain friends I hung out with, and certain drugs that I did." He also expressed frustration that she had $11,000 to buy a Honda, "but not enough to support two sons." He castigated Jeanne as "the laziest person [he had] ever known," noting that she had never gone to San Diego once to meet his aunt or uncles. When mother started to say that these grievances didn't justify his actions, he responded, "I'm not trying to make it right."

11

In June 2014, while in custody, Morlett wrote a letter to his friend that stated, in part, "Well, I have known Jeanne Morlett for over 15 years. There's nothing really good I can really say besides good cooking. I wanted a going away birthday present and I got one. Fuck that bitch."

In 2015, Morlett met on three occasions with Dr. Flores, the licensed psychologist hired by the prosecution. In those meetings, Morlett stated that Jeanne wanted to sell the house, kick him out, and send him to a homeless shelter, all of which he felt was disrespectful. Additionally, he stated Jeanne was suicidal. He acknowledged these were all part of his motive in killing Jeanne.

Finally, after deputies obtained a search warrant to search Morlett's cell phone, they discovered that his phone contained a message that read: "Jeanne E. Cobb is a bitch! . . . Ain't no recipe in your life worth having in my life. I would see over your engraved body and be as serena to the nail coffin that [sic] your soul."

PROCEDURAL HISTORY

The Orange County District Attorney filed an information charging Morlett with one count of first degree murder of Jeanne Morlett (Pen. Code, § 187, subd. (a))[2]. The information alleged that appellant personally used a deadly weapon—a pickaxe—within the meaning of section 10222, subdivision (b)(1).

In 2015, defense counsel declared a doubt pertaining to appellant's competency to stand trial. The trial court suspended proceedings and appointed two separate doctors to evaluate him. After reviewing the

---

[2] All statutory references are to the Penal Code unless stated otherwise.

12

reports of both doctors, the trial court found that he was not mentally incompetent under section 1368 and ordered criminal proceedings reinstated as of February 2016.

Later that year, defense counsel again raised a doubt as to appellant's competency. After an in camera hearing to hear an offer of proof, the trial court again suspended proceedings and ordered follow-up evaluations. The court then found that he was a mentally incompetent person under section 1367, subdivision (a).

In 2018, after a restoration of competency hearing, the trial court found Morlett to be mentally competent to stand trial pursuant to section 1368 and reinstated criminal proceedings.

Morlett's first trial commenced on September 14, 2022. The jury was unable to reach a unanimous decision as to whether he was guilty of first degree murder: 11 believed he was guilty of first degree murder, while one did not. The trial court declared a mistrial.

The retrial commenced in February 2023.

Appellant did not dispute that he killed Jeanne. His primary defense was that he suffered from schizophrenia when he killed her and that his psychosis affected his ability to understand what he was doing.

The jury found appellant guilty of first degree murder and found it true that he personally used a deadly weapon during the commission of the offense.

The sanity phase of the trial commenced on March 13, 2023. The jury concluded that appellant was sane at the time he committed the offense.

The trial court sentenced appellant to 25 years to life, followed by a determinate sentence of one year in state prison for the personal use of a deadly weapon enhancement. Morlett timely appealed.

DISCUSSION

I.

MORLETT'S CONFESSION WAS PROPERLY ADMITTED

Morlett's first contention is that his entire police interview, which was played at trial, was erroneously admitted. He argues that investigators failed to secure a knowing and intelligent *Miranda* waiver. Morlett also contends that Deputy Hansen's interaction with Morlett after Morlett invoked his right to counsel violated the bright line rule of *Edwards v. Arizona* (1981) 451 U.S. 477, 485 (*Edwards*), which requires that law enforcement cease all questioning as soon as a suspect invokes the right to counsel. Finally, he contends the confession was involuntary. "On review of a trial court's decision on a *Miranda* issue, we accept the trial court's determination of disputed facts if supported by substantial evidence, but we independently decide whether the challenged statements were obtained in violation of *Miranda*." (*People v. Davis* (2009) 46 Cal.4th 539, 586; see also *People v. Winbush* (2017) 2 Cal.5th 402, 452 (*Winbush*) [same standard for voluntariness more generally].) We conclude Morlett's contentions have no merit.

*A. Morlett's Confession Was Not Obtained in Violation of Miranda*

The Fifth Amendment provides that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself . . . ." Consequently, a criminal conviction may not be founded upon an involuntary confession. (*Winbush, supra,* 2 Cal.5th at p. 452.) To protect that right, under *Miranda,* prior to subjecting a suspect to custodial interrogation, law enforcement must advise the suspect of the right to remain silent, that anything said can be used against the suspect in a court of law, that the suspect has the right to an attorney, and if the suspect cannot afford an

14

attorney, one will be appointed free of charge. (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1086.)

Once the required advisement is given, a suspect may waive those rights either explicitly or impliedly. (*People v. Cruz* (2008) 44 Cal.4th 636, 667 (*Cruz*).) "A valid waiver need not be of predetermined form, but instead must reflect that the suspect in fact knowingly and voluntarily waived the rights delineated in the *Miranda* decision." (*Ibid.*) The burden is on the prosecution to prove by a preponderance of the evidence that the waiver was knowing and voluntary. (*People v. Nelson* (2012) 53 Cal.4th 367, 374-375.) In determining whether that was the case, courts examine the totality of the circumstances. (*People v. Williams* (2010) 49 Cal.4th 405, 425.)

The question we face here is whether Morlett impliedly waived his *Miranda* rights. At the outset of the interview, Investigator Quintalan recited to Morlett his *Miranda* rights, and Morlett stated he understood each of those rights. He was never asked to explicitly waive those rights.

However, an explicit waiver is not required. "A suspect's expressed willingness to answer questions after acknowledging an understanding of his or her *Miranda* rights has itself been held sufficient to constitute an implied waiver of such rights." (*Cruz, supra,* 44 Cal.4th at p. 667.) "Where the prosecution shows that a Miranda warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 384.) The issue, therefore, turns on whether Morlett understood his *Miranda* rights.

We begin with the obvious: he said he understood those rights.

Morlett counters that, notwithstanding his acknowledgment, he was in obvious mental distress at the time and had a history of mental illness

that undermined his professed understanding of his rights. When he was first encountered at the church, he was observed to be making "groaning, crying sounds." After he called 911 at the church, he went behind the counter and laid down in a fetal position, "kind of rocking back and forth." He had a history of a recent 5150 hold. His commentary during the interview was at times odd. And he informed the investigators that he was on anti-psychotic medication.

The flaw in Morlett's argument is that whether he understood his rights is ultimately a factual issue, and while he can point to what he describes as "substantial evidence" that he did not understand his rights, there was contrary substantial evidence, and we must ultimately resolve that factual conflict in favor of the court's ruling. There is, of course, the fact that he said he understood his rights. He also said, "I'm already going through court process actually right now. I have investigators and lawyers and attorneys already . . . ." (See *People v. Lessie* (2010) 47 Cal.4th 1152, 1169 [prior criminal cases tends to show understanding of *Miranda* rights].) Moreover, over the course of the interview, Morlett demonstrated a capacity to rationally follow the conversation. While he at times made odd comments, Morlett demonstrated an understanding of what was being told to him and asked of him. (See *People v. Cunningham* (2015) 61 Cal.4th 609, 645 ["Even if some of defendant's behavior was irrational or bizarre, there is no evidence his 'abilities to reason or comprehend or resist were in fact so disabled that he was incapable of free or rational choice.'"].) But perhaps most telling of all is the fact that when he was told that Jeanne died, he actually invoked his right to an attorney. The fact that he knew to invoke his right demonstrated that he understood it. Because he understood his *Miranda* rights and yet chose to speak with investigators, he impliedly waived those rights.

16

*B. Introduction of the Post-Invocation Portion of the Interview Did Not Violate* Edwards

Next, Morlett contends that the portion of the interview after he invoked his right to counsel (which includes all of his admissions) should have been excluded under *Edwards, supra,* 451 U.S. 477. *Edwards* sets forth a bright line rule that once a suspect unambiguously invokes the right to an attorney, law enforcement must cease the custodial interrogation until counsel is present. (*Id.* at p. 484-485.) However, even *Edwards* acknowledged that this rule applies "unless the accused himself initiates further communication, exchanges, or conversations with the police." (*Ibid.*)

"' An accused "initiates" further communication, exchanges, or conversations of the requisite nature 'when he speaks words or engages in conduct that can be "fairly said to represent a desire" on his part "to open up a more generalized discussion relating directly or indirectly to the investigation."'" (*People v. San Nicolas* (2004) 34 Cal.4th 614, 642.) "'[W]here reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation.'" (*People v. Sims* (1993) 5 Cal.4th 405, 440.)

Here, Morlett unambiguously invoked his right to counsel once he was told that Jeanne had died. He said, "Where's my lawyer? I need a lawyer. This is not okay, guys. I'm getting a lawyer." At that point, the investigators complied with their legal obligation and immediately ceased the interrogation. They left the room and Deputy Hansen was left in the room to supervise Morlett while the investigators gathered the paperwork to arrest and transfer Morlett to jail.

17

After the investigators left, Morlett initiated a conversation with Deputy Hansen. Morlett stated, without prompting, "What am I being charged with?" Deputy Hansen replied, "Oh, that's – they have to tell you that, man. I'm not allowed to – I don't even have all that stuff. I'm just here." That is when Morlett spontaneously said, "I did fuck that bitch up." Deputy Hansen then clarified what Morlett said: "You did fuck her up? Is that what you said?" Morlett: "yeah." Deputy Hansen: "Well why didn't you tell the investigators that?" Morlett: "I'm not talking to the investigator." Deputy Hansen: "Well I mean you can talk to me without a lawyer if you want. It's your, your decision." Morlett: "No, they already did their job." Deputy Hansen: "Why'd you fuck her up?" Morlett: "Cause she was – she had me ratting on, on my best friend." "She had me ratting on a few friends, that I didn't want to rat on." Deputy Hansen: "I don't want to make – I don't want it to be like I'm sitting here questioning you 'cause you asked for a lawyer, you know what I mean? So . . . ." Morlett: "Yeah. Well I know, I'm guilty . . . ." Deputy Hansen went on to ask some specifics of how Morlett did it.

It is quite clear from that conversation that Morlett reinitiated the conversation and voluntarily proceeded without an attorney. Deputy Hansen started by saying he could not give Morlett information and that he was "just here." That is when Morlett—without any prompting from Deputy Hansen—admitted to assaulting Jeanne. Hansen then cautioned Morlett *twice* that he had invoked the right to an attorney and was not subject to further questioning, but Morlett persisted in admitting what he did. This conclusion is further buttressed by the fact that when Deputy Hansen had the investigators return, Investigator Quintalan specifically reminded Morlett that he had invoked his right to counsel and asked Morlett if he had changed his mind and wanted to talk now. Morlett said he did. Investigator

18

Quintalan then repeated the question "just to make sure," and Morlett once again agreed to resume talking. Because Morlett voluntarily and knowingly reinitiated conversation without counsel, there was no violation of *Edwards* in admitting the remainder of the interview.

*C. Morlett's Admissions Were Voluntary*

Morlett's final argument is that his admissions were involuntary due to coercion by the investigators. "The prosecution has the burden of establishing by a preponderance of the evidence that a defendant's confession was voluntarily made. [Citations.] In determining whether a confession was voluntary, ' "[t]he question is whether defendant's choice to confess was not 'essentially free' because his [or her] will was overborne.'" [Citation.]" (*People v. Carrington* (2009) 47 Cal.4th 145, 169.) "To determine whether a statement was voluntary or coerced, we examine the totality of the circumstances. [Citation.] Coercive police activity is a necessary predicate but does not itself compel a finding that a resulting confession is involuntary. [Citation.] . . . The Fifth Amendment is not 'concerned with moral and psychological pressures to confess emanating from sources other than official coercion.'" (*People v. Bradford* (1997) 14 Cal.4th 1005, 1041.)

Morlett's argument is largely derivative of his previous two arguments. He states, "In the present case, Morlett had undergone a psychotic episode at the time of the underlying offense. By the time police arrived, Morlett was psychotic, had been acting unusual, and made numerous bizarre comments to both persons present at the church and the police. All objective inidic[ia] of the psychotic episode. Nevertheless, after transporting Morlett to the station, Investigator Quilantan proceeded to question Morlett without securing a knowing, intelligent and voluntary waiver of his rights under *Miranda* and then allowed a deputy to question Morlett after he

19

unequivocally requested the assistance of counsel. Together with Morlett's severe psychotic disorder, the improper tactics and techniques employed by these deputies in securing statements from Morlett overcame his free will and rendered his resulting confession involuntary."

The problem with this argument is that it is largely dependent on claims about Morlett's psychological condition rather than any coercive activity by the investigators. The failure to secure an express *Miranda* waiver is not itself coercive activity. And in the remainder of the interview, the investigators did not use any heavy handed or coercive tactics. The tone of the interview was generally friendly. As the trial court stated, "There was no coercive activity. No heavy-handedness, no promises made. The tone of the interview was easy. There was no raising of the voices." And as we already noted above, notwithstanding occasional bizarre statements, Morlett generally demonstrated a rational thought process and understanding during the interview. Accordingly, Morlett's statements were voluntary, and their admission did not violate the Fifth Amendment.

## II.

### THERE WAS NO ERROR IN REFUSING TO INSTRUCT THE JURY ON PROVOCATION

Morlett's final arguments center on the court's refusal to give instructions regarding provocation—specifically, a voluntary manslaughter instruction as a lesser included offense, as well as an instruction on how provocation impacts the degree of murder (i.e. CALCRIM No. 522). We conclude it was appropriate to refuse both instructions.

20

At trial, defense counsel requested both CALCRIM No. 522 and an instruction on voluntary manslaughter.[3] When questioned by the court about his theory of voluntary manslaughter, defense counsel explained that the provocation in this case "lasts over a period of time, beginning on 5/31, when Mr. Morlett was apparently, according to the evidence, kicked out of his [biological] mom's house." Counsel then observed that Morlett's father and Jeanne were downsizing, and there would not be room for Morlett in the new house. Counsel also relied on the incident where Morlett put patchouli oil in Jeanne's water. The court denied the requested instructions, concluding that none of this evidence demonstrated provocation.

"A heat of passion theory of manslaughter has both an objective and a subjective component." (*People v. Moye* (2009) 47 Cal.4th 537, 549 (*Moye*).) "'To satisfy the objective or "reasonable person" element of this form of voluntary manslaughter, the accused's heat of passion must be due to "sufficient provocation."'" (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1144.) "The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." (*Moye, supra,* 47 Cal.4th 537 at p. 550.)

---

[3] CALCRIM No. 522 states: "Provocation may reduce a murder from first degree to second degree [and may reduce a murder to manslaughter]. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. [Also, consider the provocation in deciding whether the defendant committed murder or manslaughter.]"

"To satisfy the subjective element of this form of voluntary manslaughter, the accused must be shown to have killed while under 'the actual influence of a strong passion' induced by such provocation." (*Moye, supra,* 47 Cal.4th at p. 550.) "'"However, if sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter . . . ."'" (*Ibid.*)

Second degree murder, unlike voluntary manslaughter, does not have an objective element. The question is simply whether the defendant was so subjectively provoked that he acted without premeditation. (*People v. Jones* (2014) 223 Cal.App.4th 995, 1000-1001.)

There was no evidence of any sort of provocation here. Certainly, from an objective standpoint, the events described by defense counsel do not even come close to the sort of provocation that would cause a person of ordinary disposition to lash out rashly. Even from a subjective perspective, there was nothing that happened the morning of the killing that suddenly provoked Morlett to act. Everything described by defense counsel occurred well before the killing, after which Morlett had plenty of time to cool down. The testimony from Morlett's father and brother showed that Morlett was acting normally the morning of the killing. As defense counsel made clear in his opening statement: "There will be no evidence of any kind that [Morlett and Jeanne] had arguments. There will be no evidence of any kind that they fought actively." This simply was not a provocation case; it was an insanity case. The court was correct to refuse provocation instructions.

# DISPOSITION

The judgment is affirmed.


                                        SANCHEZ, J.

WE CONCUR:


O'LEARY, P. J.


DELANEY, J.